**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | |
| **Plaintiff,** : | |
| : | **Case No. CR2-07-209** |
| v. : | **JUDGE ALGENON L. MARBLEY** |
| : | **Magistrate Judge Terence P. Kemp** |
| **LANCE K. POULSEN and** : | |
| **KARL A. DEMMLER** : | |
| : | |
| **Defendants.** : | |

## **OPINION AND ORDER**

### **I. INTRODUCTION**

Defendant Lance Poulsen has moved to suppress all evidence seized pursuant to the Government's wiretap of Defendant Karl Demmler's cellphone (docket no. 62).[1]  For the reasons described below, Poulsen's motion is **DENIED**.

### **II. BACKGROUND**

On August 6, 2007, the Government sought and was granted authorization to tap Demmler's cellphone and thereby listen in on his phone conversations.  The Government supported its application with a twenty-one page affidavit prepared by FBI Special Agent Jeffrey Williams (the "Williams Affidavit" or the "Affidavit").

The Williams Affidavit extensively described the Government's investigation into a possible witness-tampering scheme orchestrated by Poulsen and Demmler to benefit Poulsen in his NCFE criminal fraud case.  The following facts are taken from the Williams Affidavit.

---

[1] Demmler has moved to join in Poulsen's motion (docket no. 64).  The Court **GRANTS** Demmler's request.

On June 19, 2007, Demmler had dinner with his long-time acquaintance, Sherry Gibson, a former NCFE executive who had pleaded guilty to a criminal conspiracy count in connection with the fraud at NCFE. Gibson had recently been released from jail. Over dinner, Demmler presented a proposal from Poulsen to pay Gibson in exchange for her altering her testimony at the NCFE fraud trial. The next day, Gibson notified the Government of Poulsen's request and agreed to serve as a confidential informant.

In June and July 2007, Gibson met with Demmler in person at least three more times. These meetings were consensually recorded and observed by law-enforcement officers. Demmler explained that Poulsen wanted Gibson's help "to win his case" and that she could assist Poulsen by forgetting key conversations, pretending not to recognize signatures on key documents, and generally experiencing "amnesia" on the stand. Demmler said that Poulsen would compensate her and suggested that she ask Poulsen for more than one million dollars. Demmler also told Gibson that he had conveyed to Poulsen her willingness to "help out" and that he had told Poulsen that they would proceed with the "same things that [they] discussed." Gibson repeatedly expressed a desire to speak with Poulsen directly, but Demmler rebuffed her, saying that she should not attempt to do so, that Poulsen sounded nervous about the prospect of meeting with her, and that when the time was right, he would arrange for the three of them to sit down together in what he described on one occasion as an out of the way place, and on another occasion as a picnic table in the country.

Agent Williams explained in his Affidavit that the Government received judicial approval on July 10 to install a pen register, caller identification, and trap-and-trace device. The resulting

evidence showed that Demmler called Poulsen on dates close in proximity to his meetings with Gibson, and that Demmler called Gibson on the heels of calls he placed to Poulsen.

### III. ANALYSIS

Poulsen argues that the evidence gathered pursuant to the wiretap should be suppressed because (1) the Government failed to show that it could not accomplish its investigatory objectives through other means, before resorting to a wiretap, and (2) the Williams Affidavit was replete with factual misrepresentations and material omissions, which rendered it misleading. Neither argument is persuasive.

**A. The Government's Application Complied With The "Necessity" Requirement for Issuing Wiretaps**

In determining whether there was probable cause to support the issuance of a wiretap warrant, the "evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner." *United States v. Alfano*, 838 F.2d 158, 161-62 (6th Cir. 1988). "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to [the issuing judge's] determination." *Id.* at 162 (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)).

Under the "necessity" requirement of 18 U.S.C. § 2518, the Government must support its wiretap application by adequately explaining why other investigatory methods are likely to be futile. According to the Sixth Circuit, "what is needed is to show that wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" *Alfano*, 838 F.2d at 163 (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). To satisfy the necessity requirement, the Government must show that it gave "serious consideration" to alternative forms

3

of investigation and describe why its law-enforcement agents believe that non-wiretap techniques have failed or are likely to fail. *Id.*

Poulsen rightly concedes that the Government used several different investigatory methods before seeking permission to tap Demmler's cellphone. These included a confidential informant (Gibson), consensual recordings, a pen register,[2] physical surveillance, and documents. Nonetheless, Poulsen insists that the Williams Affidavit fails to adequately explain why the Government could not better exploit some of its investigatory channels and avail itself of others, rather than adopt the more intrusive wiretap. The necessity requirement was not satisfied, says Poulsen, because the Williams Affidavit is littered with the kinds of "garden variety, generic representations," untethered to the specific facts of this case, discounting available alternatives. Poulsen is wrong. He would compel the Government to do exactly what the case law instructs it need not do, namely, "prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163.

---

[2] Poulsen claims that the Government should not have relied upon the evidence it gathered as a result of the pen register. He asserts that the pen-register evidence established only that he and Demmler regularly spoke by phone, an unexceptional fact given that they were long-time friends. The pen-register evidence showed far more than Poulsen acknowledges. As described by Agent Williams, the pen-register evidence established that Demmler's calls to Poulsen were close in time to his meetings with Gibson and that his calls to Gibson followed calls to Poulsen. These temporal connections were relevant to the probable cause determination. *See Alfano*, 838 F.2d at 162 (dismissing argument that multiple phone calls between members of the conspiracy "could have simply involved innocuous family matters" on the grounds that "the probable cause requirement does not require that every contrary hypothesis be excluded").

1. Other Confidential Informants

Poulsen first suggests that the Government should have cultivated other former NCFE executives to serve as confidential informants. As Agent Williams explained, however, Poulsen and Demmler specifically reached out to Gibson, not to anyone else. Further, Gibson was "in a unique position of trust with" Poulsen and Demmler because she was well-acquainted with both. This was enough for the Government to explain why recruiting other confidential informants was not a reasonable possibility. For his part, Poulsen does not dispute that Gibson was apparently the only object of the alleged witness-tampering scheme, nor does he suggest who else the Government might have enlisted as an informant.

2. Direct Contact Between Gibson and Poulsen

Poulsen next argues that the Williams Affidavit did not account for why the Government could not ascertain Poulsen's involvement with the scheme by simply directing Gibson to contact Poulsen directly. Poulsen misreads the Affidavit. Agent Williams specifically noted that Gibson asked Demmler if she could speak with Poulsen directly on multiple occasions. Each time, Demmler discouraged her, making it clear that Poulsen was concerned about law-enforcement detection. Demmler implied that a face-to-face meeting would ultimately take place and that he would set it up in some out of the way place, but until then, Gibson was to refrain from contacting Poulsen. The Government need not have offered further explanation to satisfy the necessity requirement as to this argument.

3. Physical Surveillance

Poulsen claims that the Government could have employed more extensive physical surveillance of him, beyond just the single day that he was surveilled in Columbus, Ohio

following his arraignment on the superceding indictment in the NCFE fraud case. Poulsen's argument misses the mark. The Williams Affidavit makes it clear that Poulsen and Demmler planned the alleged scheme over the phone, not in person. Poulsen lived in Florida and Demmler in Ohio, so physical surveillance was not likely to turn up any relevant evidence. *United States v. Washington*, 112 F. App'x 501, 504 (6th Cir. 2004) (unpublished) (holding that where the defendant's cell phone amounted to "the virtual 'nerve center'" of a drug conspiracy, issuance of a wiretap warrant was proper "to establish the full scope of the criminal enterprise").

4.  Grand Jury Subpoenas, Interviews, and Search Warrants

Finally, Poulsen contends that the Williams Affidavit inadequately explains why the Government did not pursue relevant information through grand jury subpoenas, witness interviews and search warrants. Contrary to Poulsen's reading of the Affidavit, Agent Williams explained that such methods risked tipping off Poulsen and Demmler to the Government's investigation and thereby torpedoing it. As to grand jury subpoenas, Williams further averred that the Government had not identified any witnesses who could provide relevant information or testimony to the grand jury. Beyond alerting the subjects of the investigation, Williams noted that interviewing Poulsen and Demmler was not a realistic option because the very nature of what they appeared to be doing—witness tampering and obstructing justice—suggested that they would lie to investigators when questioned about their suspicious activities. Williams also noted that it was reasonable to infer that Demmler would lie based on statements he made evincing contempt for judicial authority.

After careful review of the Williams Affidavit and Poulsen's objections to it, the Court concludes that the Affidavit amply satisfied the necessity requirement. The Government

employed multiple investigatory techniques before seeking approval to use a wiretap, and in seeking that approval, the Government reasonably established that the only way to conclusively determine whether Poulsen was the architect of the scheme was by capturing the contents of his conversations with Demmler.

## B.  Poulsen Has Not Shown His Entitlement to a *Franks* Hearing

Poulsen attacks the Williams Affidavit on the grounds that it contains factual misrepresentations and omissions which, when corrected (in the case of the misrepresentations) and included (in the case of the omissions), shows that the Government's warrant application was not supported by probable cause.  Poulsen says that he is entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to test the validity of the Affidavit.

A defendant is entitled to a *Franks* hearing if he can make "a substantial preliminary showing that (1) a false statement, (2) knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and (3) the allegedly false statement is necessary to the finding of probable cause."  *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002).  "False statements" may also include material omissions for *Franks* purposes.  *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002).  However, "affidavits with potentially material omissions . . . are much less likely to merit a *Franks* hearing than are affidavits including allegedly false statements."  *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998).  Indeed, charges of material omissions will merit a *Franks* hearing only in "rare instances."  *Id.*

### 1. The Alleged Factual Misrepresentations

Poulsen argues that the affidavit contains nine factual misrepresentations.  The Court does not believe that Poulsen has provided sufficient support for the notion that any of the

allegedly false statements are, in fact, false, or that they were material to the issuing judge's finding of probable cause. Without going into a lengthy discussion explaining why Poulsen's falsity argument fails, the Court takes a more direct route, and dismisses Poulsen's claim on the grounds that he has not made any showing, let alone a "substantial preliminary showing," that Agent Williams made any of the purportedly false statements intentionally or with reckless disregard for their truth. In the absence of competent proof that Agent Williams acted with the requisite state of mind, Poulsen cannot maintain his claim. *See Franks*, 438 U.S. at 131-32 (stating that a defendant's "allegations must be accompanied by an offer of proof," such as "[a]ffidavits or sworn or otherwise reliable statements of witnesses"). Accordingly, the Court concludes that Poulsen has not carried his burden to obtain a *Franks* hearing on the basis of the alleged factual misstatements.

### 2. The Alleged Omissions

Poulsen bases his second argument on behalf of a *Franks* hearing on his contention that the Williams Affidavit omitted material information about his motives in reaching out to Gibson that, had it been included, would have negated a probable cause finding. The alleged omissions pertain to paragraphs 8(r) and 8(u) of the Affidavit, which describe the contents of a voice mail message that Demmler left Gibson on July 19, 2007, and a telephone conversation between Demmler and Gibson on July 25, 2007. Poulsen says that Demmler's recorded statements show that Poulsen's goal was not to improperly influence Gibson's testimony, but to help her recover what she had lost as a result of the Government's prosecution. In support, Poulsen proffers the transcript of the July 25 phone conversation between Demmler and Gibson, in which Demmler said the following:

> He [Poulsen] informed me today, after doing a little bit of research and chatting with his attorneys and everything else, that, one, he believes, and so do they, that you can rescind all your testimony.
>
> He believes that you can get the felony count dropped against yourself. He believes, and their attorneys believe, you can get whatever the government has taken away from you back.
>
> [H]e [Poulsen] said, 'I'm working on some situations right now. One to get her some funds with regards to defending herself and getting this matter cleared up and then she'll be able to join in as an employee again with all these other lawsuits going on.
>
> What we're trying to do—what he [Poulsen] says, quote 'What we're trying to do for Sherry is get her out of all of this. Get the felony dropped, get everything back that the government has taken away, and allow her to join in on three suits, all three suits, and then—and we'll take care of attorneys and everything else. This way she'll be able to get some kind of remedy as far as spending time in jail and get some money back and everything else.

These statements, says Poulsen, "clearly evidence [his] legitimate belief that [Gibson] was wrongfully prosecuted or at least ill-advised by her attorney," and therefore are inconsistent with the allegation that his intent was to improperly influence Gibson's testimony.

Even had Agent Williams included each of Demmler's statements above, there is no reason to think that the probable cause determination would have been any different. In fact, just the opposite is true: Keeping in mind Demmler's consistent representations to Gibson that Poulsen would pay her to feed prosecutors, and ultimately the jury, misleading information, Demmler's statements on July 25 are best viewed as further incentives concocted by Poulsen to induce her cooperation. Certainly the promise of money by joining civil lawsuits initiated by Poulsen and the promise of assistance in getting her conviction reversed were entirely consistent with Poulsen's offer to compensate Gibson in exchange for her favorable testimony. Poulsen's argument thus depends on divorcing Demmler's July 25 conversation with Gibson from the

history of his statements to her over the prior month regarding what assistance Poulsen was seeking from Gibson (for her to develop "amnesia" on the stand), why he wanted that assistance ("to win his case"), and what he agreed to do in return (pay her). The Court declines Poulsen's invitation to ignore the complete factual context giving rise to the July 25 conversation.

Poulsen also argues that the July 25 transcript shows that his reluctance to meet with Gibson stemmed only from his concern that such a meeting "might not be legally appropriate," and that he was seeking to coordinate the meeting through his counsel. His desire to involve his counsel, Poulsen says, undermines the Government's charge that he was engaged in wrongdoing.

As an initial matter, the July 25 transcript does not automatically give rise to the inference that the reason Poulsen was wary of meeting with Gibson was because he believed that such a meeting was best arranged through his counsel. True, the transcript does contain statements by Demmler indicating that Poulsen had discussed Gibson's situation with his lawyers. Demmler also quotes Poulsen as saying, "I can't talk to Sherry direct right now. I'm working on it." Neither of these things, however, demands the conclusion that Poulsen intended any future meeting with Gibson to take place openly at the behest of his counsel. Thus, even had Agent Williams set forth Demmler's July 25 statements more fully, they would not have changed the probable cause determination. This conclusion is bolstered by the fact—ignored by Poulsen—that in the same July 25 conversation Demmler suggested to Gibson that the three of them meet at a picnic table in the country to discuss "a few things," and that Poulsen agreed with this idea. Demmler also told Gibson that Poulsen did not want to get caught in the "middle of a situation even though it's gonna be good, that somebody could pick up somethin' and make it bad." Whatever Poulsen's asserted reasons now for not wanting to speak directly with Gibson,

Demmler's contemporaneous statements cast considerable doubt on Poulsen's insistence that his motives were pure.

Accordingly, the Court concludes that Poulsen has failed to carry the heavy burden of establishing that he is entitled to a *Franks* hearing based on the purported material omissions in the Williams Affidavit.

## IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Poulsen's motion to suppress (docket no. 62).

**IT IS SO ORDERED.**

                                              s/Algenon L. Marbley
                                              **ALGENON L. MARBLEY**
                                              **United States District Court Judge**

**DATE: March 17, 2008**