IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : Case No. 2:07-CR-209 |
| | : JUDGE ALGENON L. MARBLEY |
| KARL A. DEMMLER and | : |
| LANCE K. POULSEN, | : |
| Defendants. | : |

## OPINION AND ORDER

### I. INTRODUCTION

Defendants Lance K. Poulsen and Karl A. Demmler renew their motions for judgment of acquittal under Federal Rule of Criminal Procedure 29(c)(1). In the alternate, Poulsen and Demmler move for a new trial pursuant to Federal Rule of Criminal Procedure 33. The Court finds that the evidence presented at trial was sufficient for the jury to find the Defendants guilty beyond a reasonable doubt. Therefore, Defendants' Rule 29 and Rule 33 motions are **DENIED**.

### II. ANALYSIS

#### A. Legal Standards

Federal Rule of Criminal Procedure 29 allows the Court to enter a judgment of acquittal if the evidence presented at trial was "insufficient to sustain a conviction." The standard for measuring insufficiency "is whether, after viewing the evidence in a light most favorable to the

1

prosecution, any rational trier of fact could not have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

Similarly, Federal Rule of Criminal Procedure 33 allows the Court "to vacate any judgment and grant a new trial if the interest of justice so requires." The Sixth Circuit has held that "justice" may require a new trial when "the jury's verdict was against the manifest weight of the evidence." *U.S. v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). However, "such motions are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Id.* at 592-93.

### B. Background

Poulsen and Demmler were indicted on multiple counts of witness tampering, obstruction of justice, and conspiracy to commit these offenses, in connection with their efforts to improperly influence the testimony of Sheri Gibson. Gibson was a former senior executive at National Century Financial Enterprises ("National Century"), who pleaded guilty to criminal fraud charges and is expected to testify against Poulsen in his upcoming trial in *United States v. Poulsen*, No. 06-129, pending before this Court. Poulsen served as Chairman and Chief Executive Officer of National Century between 1990 and 2002, when National Century declared bankruptcy. If Poulsen is convicted on all counts in the fraud case, he likely faces a lengthy term of incarceration.

Poulsen and Demmler pleaded not guilty to the witness tampering and obstruction charges and proceeded to trial in March 2007. The jury convicted both men on all counts. The evidence adduced at trial established that Poulsen and Demmler were long-time friends. Poulsen

2

and his National Century colleagues, including Gibson, used to frequent a Columbus restaurant owned by Demmler. Beginning in March 2007 and continuing until their arrests in late October 2007, Poulsen and Demmler conspired together to convince Gibson to alter her expected testimony at trial so as not to implicate Poulsen in any wrongdoing. Demmler served as the go-between, relaying instructions and promises to pay from Poulsen to Gibson and communicating Gibson's questions and monetary demands back to Poulsen. In return for facilitating the arrangement between Poulsen and Gibson, Poulsen agreed to pay Demmler a percentage of the money that Gibson was to receive.

After Gibson realized what Poulsen and Demmler were up to, she informed the Government of their plan to pay her off in exchange for her favorable testimony at Poulsen's fraud trial. Through a court-ordered wiretap and consensual recordings, the Government captured conversations between Poulsen and Demmler discussing how Gibson should suffer memory lapses on the stand and how she should be paid, as well as conversations between Demmler and Gibson discussing the same.

At the close of the Government's case-in-chief and again at the close of all the evidence, the Defendants moved for a judgment of acquittal. Poulsen and Demmler now renew their motions. For the reasons discussed below, the Court concludes that the jury's verdicts are amply supported by the evidence.

### C. Sufficiency of the Evidence as to Demmler

Demmler argues that the evidence presented at trial was insufficient to support his conviction. Instead, he argues that the evidence more reasonably showed that he was "merely

3

trying to assist a good friend in recouping her assets and possibly having her conviction overturned." Demmler is wrong.

First, the evidence presented at trial showed that at their first meeting on June 19, 2007, Demmler greeted Gibson by saying "business first," and then proceeded to tell her that Poulsen wanted to make her "whole."

Furthermore, throughout the course of their meetings and telephone communications between June and October 2007, Demmler represented that he was in touch with Poulsen and acting at Poulsen's direction. Phone records substantiate this claim. Between January and May 2007, Poulsen and Demmler contacted one another by phone more than thirty-two times. The longest of these, a twenty-five minute call on May 25, occurred less than a month before Demmler first met with Gibson. Telephone records also show that Demmler and Poulsen spoke to one another on or near dates on which Demmler met with Gibson. On a few occasions, Demmler called either Poulsen or Gibson immediately after finishing a call with the other.

Documents recovered from Demmler's apartment show that he corresponded with Poulsen about the scheme through the mail. In a letter dated February 25, 2007, which was several months before Gibson was released from jail, Demmler wrote Poulsen to confirm the receipt of documents Poulsen sent him. Demmler said he was enclosing a letter he had received from Gibson and asked whether Poulsen wanted him to do anything: He specifically inquired whether he should "send Sherry the lawsuit you sent me? Should I go down and see her?," apparently a reference to visiting her in jail. Similarly, in a letter dated September 24, Demmler gave Poulsen an update on his dealings with Gibson, told Poulsen that Gibson wanted twenty-

4

five thousand dollars for her participation in the scheme, and expressed the hope that Poulsen would see fit to "reward" him if their plans succeeded.

Finally, the recorded intercepts of Demmler's and Poulsen's calls further confirm that they were in regular contact about Gibson. Demmler and Poulsen used a crude code on these calls, referring to Gibson as "Mary," "our person," and "our friend." They expressed concern about speaking too explicitly over the phone and talked about using "secure" lines.

Next, the evidence supports the conclusion that Demmler asked Gibson to lie. On the recordings of their eight meetings between June and October 2007, Demmler can be repeatedly overheard telling Gibson to suffer "mental lapses" in her interviews with prosecutors and while testifying at the National Century fraud trial; that "it's not what you make up, it's what you forget;" that she should have "amnesia;" and that she should "prevaricate," "sidestep," and confuse the jury. Demmler implied that this task would be made easier by the fact that "most juries are gonna be ignorant and have no clue."

Demmler also regularly discussed payment with Gibson. At first, Demmler conveyed an offer from Poulsen to allow her to join civil suits Poulsen had filed in connection with National Century's collapse. When Gibson expressed her view that these suits were meritless, Demmler came back with an offer from Poulsen to pay her out of National Century's Directors' and Officers' liability insurance. Demmler suggested that the money from Poulsen could be funneled through Paragon Legal Services, Demmler's company, and disguised as "miscellaneous billings." After Demmler sent Poulsen a letter explaining that Gibson wanted "25K to do what is necessary to win the criminal case," Demmler received a message from Poulsen confirming his agreement

5

to pay, which Demmler relayed to Gibson. In their last meeting in October 2007 before Demmler was arrested, Demmler gave Gibson a blank, unsigned check drawn on Paragon Legal Services's account, explaining that as soon as Poulsen's wire transfer hit the account, Gibson could write out the check to herself and cash it.

For all of these reasons, the jury reasonably could have determined that Demmler was guilty beyond a reasonable doubt of the charged offenses. His Rule 29 and Rule 33 motions are therefore **DENIED**.

### D. Sufficiency of the Evidence as to Poulsen

In support of his motion, Poulsen argues that the evidence does not establish, beyond a reasonable doubt, that he entered into any agreement with Demmler to tamper with Gibson's testimony or obstruct justice. Poulsen further claims that the evidence is insufficent to show that he possessed the necessary intent to improperly influence Gibson's testimony, or that he was even conscious that his communications with Gibson, through Demmler, could be wrongful. The Court is not persuaded.

The jury reasonably could and did find, based on the evidence presented, that Poulsen reached out to Gibson through his long-time friend Demmler, to convince her to alter her testimony in exchange for payment, and that Poulsen undertook these efforts in the spring and summer of 2007, rather than some earlier date, due to the imminence of the National Century fraud trial. The jury could have fairly relied on the following evidence to convict Poulsen: (1) Demmler's explanation that the reason why Poulsen wanted Gibson to suffer "memory lapses" and "amnesia" was "to win his case," referring to the National Century fraud trial; (2) Demmler's

6

characterization of himself as the "middleman" in the transaction; (3) the telephone records, letters, and recorded calls showing that Demmler and Poulsen were in regular touch in the months leading up to Demmler's first meeting with Gibson and during the period of the alleged scheme in the summer and fall of 2007; (4) Demmler's and Poulsen's recorded telephone calls, in which they refer to Gibson as "Mary," "our person," and "our friend," and discuss safeguarding the confidentiality of their conversations by speaking over "secure" phone lines; (5) Poulsen's efforts to convince Gibson to fire her attorney and his assertion that his own attorney did not know anything about the "three amigos;" (6) Poulsen's recorded statement to Demmler to "tell our friend . . . we're very much on board;" (7) Poulsen's agreement to pay Gibson in response to Demmler's statement that she needs "25K to do what is necessary to win the criminal case;" and (8) Poulsen's conversations with Demmler in which they discuss how to structure payments to Gibson to avoid detection by law enforcement.

Moreover, recorded calls between Poulsen and Demmler in September and October are particularly probative of Poulsen's conduct. At least twice, Poulsen can be heard appearing to agree with Demmler that Gibson should not be completely forthcoming with prosecutors. In a call on September 28, Demmler said that Gibson could "prevaricate," to which Poulsen responded, "yep." Later in the same conversation, Demmler mentions that Gibson is scheduled to meet with prosecutors that day, so he is going to ask her to have an "amnesia day." Poulsen again responded "yeah."

Calls between Demmler and Poulsen on September 26 and September 28, 2007, reflect Poulsen's efforts to get Gibson to testify consistently with his defense theory in the National Century fraud case. In response to Gibson's inquiry about how to answer the prosecutors'

7

questions regarding National Century's August 1995 investor report, Poulsen explained to Demmler that he did not actually sign or view that report, but that his signature stamp was used instead. Further, Poulsen said that "Mary" was confused in her prior statements to the Government because she was shown National Century's 1995 indenture which, unbeknownst to "Mary" through no fault of her own, had been replaced in 1998. The jury could reasonably construe such remarks as veiled instructions from Poulsen about how Gibson should testify.

In addition, in the September 28 phone call, Poulsen suggested that "Mary" could tell prosecutors that she was not familiar with the relevant facts: In Poulsen's own words, "one of the best things for her to say is, you know, I said what I said based on the best information I had. But now, this is a new set of charges and it's a new indictment and I'm not familiar with it, which is true." "You know they can't make her say stuff about something that she's not familiar with." The jury could conclude that Poulsen was tampering with Gibson by advising her to withhold information from prosecutors and to use the superseding indictment as an excuse to cover any discrepancies between her prior testimony and her current testimony.

Finally, the jury reasonably could have concluded that Poulsen's rather elaborate efforts to conceal his promised payments to Gibson are consistent with a scheme to commit witness tampering and obstruction of justice. Poulsen told Demmler that he would wire money to Demmler's Paragon Legal Services account in an amount around $5,000, but not exactly $5,000, each month. He explained that he wanted Demmler to make sure that the amount going out to Gibson did not exactly correspond to the amount Poulsen wired him. Poulsen also said that he would wire the money from an account that he used to pay for all his legal expenses, and that he would arrange additional engagements with Paragon to make the payments to Gibson look like

8

"normal transactions." The point of these measures, according to Poulsen, was because they didn't "wanna win the big issue and then get caught up on some technicality."

All of this evidence was sufficient for the jury to conclude that Poulsen committed the charged offenses. His Rule 29 and Rule 33 motions are therefore **DENIED**.

### III. CONCLUSION

After reviewing the evidence adduced at trial, the Court concludes that there is no basis to set aside the guilty verdicts or grant the Defendants new trials. Accordingly, their Rule 29 and Rule 33 motions are **DENIED**.

**IT IS SO ORDERED.**

                                                  **s/Algenon L. Marbley**
                                                  **ALGENON L. MARBLEY**
                                                  **United States District Court Judge**

**DATE: August 7, 2008**